UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.

DOMINICK PIZZONIA,

        Defendant.

---

No. 05-CR-425 (JBW)

AMENDED
MEMORANDUM AND ORDER ON
RELEASE OF VIDEO RECORDINGS

Appearances:

For the Press:
    New York Newsday
    235 Pinelawn Road
    Melville, New York
    By:    Anthony DeStefano

For the United States:
    United States Attorneys Office
    Eastern District of New York
    One Pierrepont Plaza
    Brooklyn, New York
    By:    Winston Y. Chan
            Mitra Hormozi
            Joseph Lipton
            Deborah Sue Mayer

For Defendant:
    Rubinstein & Corozzo LLP
    260 Madison Avenue
    New York, New York
    By:    Joseph R. Corozzo, Jr.

For Defense Counsel:
    Law Offices of Gerald L. Shargel
    570 Lexington Avenue, 16th Floor
    New York, New York 10022
    By:    Henry Mazurek

JACK B. WEINSTEIN, Senior District Judge:

In this RICO conspiracy prosecution, the press has moved by letter for the release of audio-video recordings offered into evidence by the government in support of its motion to disqualify defense counsel. The motion is granted in part.

I. **Facts**

Defendant Dominick Pizzonia is accused of a racketeering conspiracy involving homicide, loan-sharking and extortion. He is alleged to be an officer of the Gambino crime family. Citing multiple conflicts of interest—including the allegation that defendant's attorney has served as "house counsel" to the Gambino family—the government has moved for disqualification of defense counsel Joseph Corozzo. The disqualification motion is the subject of another memorandum and order. *See* Amended Mem. & Order on Disqualification of February 14, 2006.

On February 6, 2006, in open court, the government placed in evidence at the disqualification hearing two audio-video recordings of defense counsel consulting with John Gotti, Sr.—the late head of the Gambino family—at the United States Medical Center for Prisoners in Springfield, Missouri. On February 7, 2006 members of the press moved by letter for release of the recordings. Defense counsel objects on both Gotti's behalf, citing the attorney-client privilege; and on defendant's behalf, on the grounds that airing the recordings on television will unfairly prejudice any jury that may be impaneled in his case. No member of the Gotti

family was present to express any objection to the recordings' release on the grounds that it might invade the privacy of the now-deceased John Gotti, Sr.

The press was present at the February 6, 2006 hearing. It saw and heard the videos as they were played in open court.

The press does not seek to make a television recording of the criminal proceedings themselves, a practice frowned upon by the Judicial Conference of the United States. *See* Statement of Judge Diarmuid O'Scannlain on Behalf of the Judicial Conference of the United States Regarding S. 829 as Applied to Federal Trial Courts ("[W]e believe that the intimidating effect of cameras on litigants, witnesses, and jurors has a profoundly negative impact on the trial process."). Rather, it requests access to "documents" already in evidence—the audio-video recordings of defense counsel and John Gotti, Sr. meeting in prison.

## II.     Attorney-Client Privilege

### A.     Law

The attorney-client privilege protects confidential communications made in furtherance of the provision of legal services to the client. In federal criminal prosecutions, except as required by federal constitutional provision, statute, or rule, the privilege is "governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." Fed. R. Evid. 501.

The privilege survives the death of the client. *Swidler & Berlin v. United States*, 524 U.S. 399, 406, 118 S. Ct. 2081, 2086 (1998) ("[T]he general rule is that the attorney-client privilege

3

continues after death."). It may be asserted by the attorney, as it necessarily is whenever it is asserted posthumously. *See Swidler*, 524 U.S. at 401-2, 118 S. Ct. at 2083 (privilege asserted by attorney who had represented deceased client).

The privilege does not protect communications between an attorney and client that are part of an attempt to commit a crime or fraud. *Clark v. United States*, 289 U.S. 1, 15, 53 S. Ct. 465, 469 (1933) ("A client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law."); *United States v. Gotti*, 771 F. Supp. 535, 542 (E.D.N.Y. 1991) ("The privilege is also not available for communications made for the purpose of committing a crime . . . ."). Statements to an attorney that do not pertain to legal advice are not protected. *See, e.g., Gotti*, 771 F. Supp. at 542 ("The privilege is not available if the communication was not made for the purpose of obtaining legal advice.").

### B.     Application of Law to Facts

The recordings now sought are not covered by the attorney-client privilege. Only communications related to legal representation are protected by the privilege. Though defense counsel claims to have been representing Gotti at the time, the remarks in the recordings are of a personal, not a professional, nature. Gotti, a dying man with less than his full faculties, appears to be complaining about mutual friends and acquaintances.

If the remarks were to be found related to legal representation, they would be excluded from the privilege under the fraud and crime exception. Cast as communications in furtherance of legal representation, the words and gestures would be interpreted to relate to Gotti's desire to

4

illegally interfere with a contemporaneous prosecution of a Gambino family member in Atlanta, Georgia.

For the purposes of this motion, the attorney-client privilege does not bar release of the recordings. They are not so demeaning to Gotti, Sr. as to warrant exclusion as a violation of any continuing right to privacy he or his family might successfully claim.

## III. Access to Documents in Evidence

### A. Law

Criminal trials have been presumed to be open to the public since "back beyond reliable historical records." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 564, 100 S. Ct. 2814, 2821 (1980) (in the Anglo-American legal tradition, criminal trials have been open since before the Norman Conquest). This presumption extends to preliminary criminal proceedings. *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8, 106 S. Ct. 2735, 2740 (1986) (*Press-Enterprise II*). Open criminal proceedings "enhance[] both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system." *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 508, 104 S. Ct. 819, 823 (1984) (*Press Enterprise I*).

At the founding of the Republic, the accused's right to a public trial was an important safeguard against Star Chamber-style proceedings. *See* U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and *public* trial . . . ." (emphasis supplied)). The First Amendment guarantees of freedom of speech and of the press have been interpreted to require that criminal trials remain open to the press and public. *Richmond*

*Newspapers*, 448 U.S. at 575, 100 S. Ct. at 2826 ("[T]he First Amendment can be read as protecting the right of everyone to attend trials so as to give meaning to those explicit guarantees.").

The accused may not always desire unlimited public access to all stages of the criminal proceedings, particularly collateral proceedings intended to screen out unduly prejudicial information. "[T]here are some limited circumstances in which the right of the accused to a fair trial might be undermined by publicity." *Press-Enterprise II*, 478 U.S. at 9, 106 S. Ct. at 2741. In these instances, the Sixth Amendment guarantee of trial by an impartial jury is in tension with the public's right to assure itself that justice is being done.

There is a "strong presumption" in favor of permitting a member of the public to "inspect and copy 'any item entered into evidence at a public session of a trial.'" *United States v. Graham*, 257 F.3d 143, 149 (2d Cir. 2001) (quoting *Application of Nat'l Broadcasting Co.*, 635 F.2d 945, 952 (2d Cir. 1980) (*Myers*). As a representative of the press noted at oral argument, the theoretical right of all members of the public to actually be present at a trial is limited in practice by space and time constraints. Not all who are interested can physically attend. *See Myers*, 635 F.2d at 952. The First Amendment guarantee of freedom of the press and the strong interest of the public in the rule of law, which requires open court proceedings, counsels strongly in favor of release to the press and other media.

Yet, "[e]very court has supervisory power over its own records and files . . . ." *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 598, 98 S. Ct. 1306, 1312 (1978). "The existence of the common law right to inspect and copy judicial records," while "beyond dispute," is "not

absolute." *United States v. Graham*, 257 F.3d at 149 (defendants objected to court's order permitting media to copy videotapes entered into evidence at open detention hearing) (citations omitted). "[A]ccess has been denied where court files might have become a vehicle for improper purposes." *Nixon*, 435 U.S. at 598 (identifying promotion of "public scandal," providing a "reservoir of libelous statements," or serving as a source of confidential business information as "improper purposes").

The strength of the presumption of access varies with the importance of the evidence to judicial decision-making. "[T]he weight to be given the presumption of access must be governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts." *United States v. Amodeo*, 71 F.3d 1044, 1049 (2d Cir. 1995). While the right of access to a document that has been introduced at trial, or is otherwise material to a court's disposition of a case on the merits, is strong, *United States v. Graham*, 257 F.3d at 151, it is "appreciably weaker" for documents that do "not serve as the basis for a substantive determination . . . ." *Id.*

### B. Application of Law to Facts

Because of the preoccupation of the press and television media with organized crime, release of the videos will undoubtedly result in widespread viewing on television by a large part of the population from which the jury in this case will shortly be chosen. The chance that some jurors will connect the mafia with counsel and thus with this defendant is great. It argues against release of the videos.

Should the audio-video recordings be widely distributed, some potential jurors would likely be biased against defendant. He is accused of participating in a racketeering enterprise—namely, the Gambino family. The recordings show defense counsel speaking on fairly intimate terms with Gotti, Sr., the late head of the Gambino family. After viewing these recordings and learning of the pending trial, potential jurors might reason—without regard to the evidence admitted at trial—that defendant himself was an intimate of Gotti.

The government's motion to disqualify defense counsel is ancillary to defendant's trial on the merits. The recordings do not serve "as the basis for substantive determination." *Graham* at 151. This factor weighs against release.

Defendant properly raises no objection to the release of the transcripts of the tapes, or to the press reviewing the audio-video recordings at the courthouse. He objects only to the copying and distribution of the audio-video recordings.

## IV. Conclusion

The audio-video recordings will not be released. Members of the press may have copies of the transcripts of the February 6, 2006 proceedings and all other proceedings in this prosecution. They may review the audio-video recordings at the court upon request to the Clerk. They may also have copies of the transcripts of the video.

Permitting public access only to the transcripts honors the public's right to know, but avoids threatening defendant's Sixth Amendment right to an impartial jury. On balance, the interest of the public in ensuring that this litigation proceeds in accordance with the rule of law, and that members of the bar remain accountable for their acts, warrants release of the transcripts

8

and access to the audio-video recordings at the court, but not release of the recordings beyond the courthouse doors. Voir dire of the jury panel will adequately ensure that no unfair prejudice accrues to defendant from release of the transcripts.

The "picture" here is so much more vivid and prejudicial than the "word" that this partial satisfaction of the public's need to know and of the defendant's rights supports the compromise now ordered.

SO ORDERED.

Jack B. Weinstein

Dated: February 14, 2006
Brooklyn, New York